Scott E. Davis
State Bar No. 016160
SCOTT E. DAVIS, P.C.
8360 E. Raintree Drive, Suite 140
Scottsdale, AZ 85260

Telephone:  (602) 482-4300
Facsimile:   (602) 569-9720
email: davis@scottdavispc.com

*Attorney for Plaintiff Melea Maltzberger*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Melea Maltzberger,<br><br>          Plaintiff,<br><br>     v.<br><br>Lincoln Life Assurance Company of Boston; Homesite Insurance Group; The Homesite Insurance Group Disability Income Replacement Plan; The Homesite Insurance Group Group Life Insurance Plan,<br><br>          Defendants. | Case No.<br><br>**COMPLAINT**<br><br>Count I:  ERISA claim for long-term disability benefits<br><br>Count II: ERISA claim for the waiver of the premium on a life insurance policy |

Now comes the Plaintiff Melea Maltzberger (hereinafter referred to as "Ms. Maltzberger"), by and through her attorney, Scott E. Davis, complains against the Defendants as follows:

### *Jurisdiction*

1.      Jurisdiction of the court is based upon the Employee Retirement Income Security Act of 1974 (ERISA); and in particular, 29 U.S.C. §§ 1132(e)(1) and 1132(f).  Those provisions give the district courts jurisdiction to hear civil actions brought to recover employee benefits.  In addition, this action may be brought before this Court pursuant to 28

U.S.C. § 1331, which gives the Court jurisdiction over actions that arise under the laws of the United States.

### *Parties*

2.      At all times relevant to this action, Ms. Maltzberger was a resident of Maricopa County, Arizona.

3.      Upon information and belief, Homesite Insurance Group, a Massachusetts corporation (hereinafter referred to as the "Company"), sponsored, administered and purchased a group long-term disability ("LTD") insurance Policy (hereinafter referred to as the "LTD Policy") which was issued to the Company in the State of Massachusetts, and is fully insured by Lincoln Life Assurance Company of Boston (hereinafter referred to as "Lincoln").

4.      The specific Lincoln group LTD Policy is known as Group Policy No. GF3-810-261236-01 (the Policy is attached hereto as Exhibit "A").

5.      The Company's purpose in purchasing the LTD Policy was to provide disability insurance and income protection for its employees.

6.      Upon information and belief, the LTD Policy may have been included in and part of an employee benefit plan, specifically named The Homesite Insurance Group Disability Income Replacement Plan (hereinafter referred to as the "LTD Plan") which may have been created to provide the Company's employees with welfare benefits.

7.      At all times relevant hereto, the LTD Plan constituted an ERISA "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1).

8.      In addition, through a Lincoln fully insured group life insurance policy known as Policy No. SA3-810-261236-01 (hereinafter referred to as the "Life Insurance Policy"), Ms. Maltzberger was afforded life insurance coverage. The Life Insurance Policy contained a feature which waived any premiums due from her on the Life Insurance Policy

(hereinafter referred to as the "Life Insurance Waiver of Premium benefit") if she is found to meet the definition of disability in the Life Policy, as is more specifically pled *infra*.

9.     The Company's purpose in sponsoring, administering and purchasing Lincoln's Life Policy was to provide life insurance benefits and/or other welfare benefits for its employees.

10.     Upon information and belief, the Life Insurance Policy may have been included in and part of an employee benefit plan, specifically named The Homesite Insurance Group Group Life Insurance Plan (hereinafter referred to as the "Life Insurance Plan").

11.     LTD Policy No. GF3-810-261236-01 and Life Policy No. SA3-810-261236-01, may at times hereinafter be referred to collectively as the "Policies."

12.     Ms. Maltzberger's LTD claim as well as her claim for the life insurance waiver of premium ("LWOP") benefit are at times hereinafter collectively referred to as the "claims."

13.     Upon information and belief, Lincoln functioned as the claim administrator of the Policies; however, pursuant to the relevant ERISA regulation, the Company, and/or the LTD Plan, and/or the Life Plan may not have made a proper delegation or properly vested fiduciary authority or power for claim administration in Lincoln.

14.     Lincoln operated under a structural financial conflict of interest in administering both claims, because it fully insured both Policies and made every decision regarding whether Ms. Maltzberger was disabled in both claims.

15.     In administering Ms. Maltzberger's claims, Lincoln operated under dual and conflicting roles as the decision maker regarding whether Ms. Maltzberger was disabled, and also the payor of benefits if it found she was disabled.

16.     Lincoln's structural financial conflict of interest existed and manifested because if it found Ms. Maltzberger was disabled in either claim, it was then financially liable

1  to pay her LTD benefits, and/or liable to provide life insurance coverage while waiving any

2  premiums due on the Life Policy which provided coverage for Ms. Maltzberger and her

3  family/dependents.

4        17.    The Company, Lincoln, the LTD Plan, and the Life Insurance Plan conduct

5  business within Maricopa County and all events giving rise to this Complaint occurred within

6  Arizona.

7                                        ***Venue***

8        18.    Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C.

9  § 1391.

10                       ***General Allegations Common to Both Claims***

11       19.    Incident to her employment, Ms. Maltzberger was a covered employee

12  pursuant to the LTD Plan, the Life Insurance Plan and the relevant Policies, and a

13  "participant" as defined by 29 U.S.C. § 1002(7).

14       20.    Ms. Maltzberger seeks disability income benefits in the form of "Any

15  Occupation" LTD benefits from the LTD Plan and the relevant LTD Policy pursuant to §

16  502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), as well as any other non-disability

17  employee benefits she may be entitled to from the LTD Plan, from any other Company Plan,

18  and/or from the Company itself as a result of being found disabled in this action.

19       21.    Ms. Maltzberger seeks life insurance coverage and the waiver of any premiums

20  due on the life insurance coverage from the Life Insurance Plan and the relevant Life

21  Insurance  Policy pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), as well

22  as any other employee benefits she may be entitled to from that Plan, from any other Company

23  Plan, and/or from the Company itself as a result of being found disabled in this action.

24       22.    After working for the Company as a loyal employee in the occupation of a Sales

25  Agent, on or about April 3, 2016, due to serious medical conditions Ms. Maltzberger became

26  disabled from working in that occupation and also in any occupation.

23.     Ms. Maltzberger has remained continuously disabled as those terms are defined in the relevant Policies since the day she became disabled, and she has not returned to work in any occupation as a result of her serious disabling medical conditions.

24.     Following the onset of her disability, Ms. Maltzberger filed a claim for short-term disability ("STD") benefits which was administered, reviewed and approved by Lincoln.

25.     After reviewing the evidence supporting Ms. Maltzberger's STD claim, Lincoln concluded she met the definition of disability set forth in the STD Plan for the maximum duration of the time STD benefits could be paid, which was ninety (90) days.

26.     Ms. Maltzberger's STD benefits have been fully paid and exhausted.

27.     Following the exhaustion of her STD claim/benefits, Ms. Maltzberger remained disabled from working in any occupation and filed a claim for LTD benefits under the relevant LTD Policy.

28.     As referenced, Lincoln made every decision in Ms. Maltzberger's LTD claim regarding whether she was disabled pursuant to the terms of the relevant LTD Policy.

29.     Upon information and belief, the relevant Lincoln LTD Policy's definition of disability governing Ms. Maltzberger's LTD claim is as follows:

"Disability" or "Disabled" means:

    i.     that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

    ii.    thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

30.     In support of her claims for LTD and LWOP benefits, Ms. Maltzberger submitted to Lincoln medical and other evidence which supported, and continues to support, her allegation that she met and meets *any* definition of disability set forth in the LTD and Life Insurance Policies.

31.     Lincoln approved Ms. Maltzberger's LTD claim and paid disability benefits from July 4, 2016 through December 9, 2016, when it terminated them without any credible medical documentation supporting its allegation her disabling medical conditions had improved in a way that allowed her to return to work in her own occupation or work in any other occupation.

32.     In a letter dated December 9, 2016, Lincoln informed Ms. Maltzberger it was terminating her LTD benefits beyond that same date based on its finding she no longer met the "Own Occupation" definition of disability set forth in the LTD Policy.

33.     Ms. Maltzberger alleges that Lincoln's termination of her LTD benefits after nothing had improved or changed with her disabling medical conditions in a manner allowing her to return to work, was motivated by its financial conflict of interest and desire to save money by not paying those benefits.

34.     As part of its review which led to the termination of Ms. Maltzberger's LTD claim/benefits, Lincoln obtained a medical records only "paper review" (meaning the consultant ***never*** spoke to, saw or physically examined Ms. Maltzberger) from a doctor its third-party vendor retained, named William P. Jennings, M.D.

35.     Dr. Jennings was retained by Lincoln through its third-party vendor named the MLS Group of Companies, Inc. (hereinafter referred to as "MLS").

36.     Information on MLS' website confirms its services are for the purpose of: "[MLS'] IME and Peer Review Disability Reviews focus on function and an employee's ability to return to work." (*See* Exhibit "B" for information from MLS' website).

37.     MLS' website also confirms it **does not** provide services for plaintiffs or disability claimants/insureds in their disability or other claims.

38.     Ms. Maltzberger alleges that as it relates to MLS' motives in her claim, it is not an independent or impartial company due to its long-term relationship with Lincoln and the disability insurance industry.

39.   MLS has a long, extensive business relationship with Lincoln.

40.   MLS has a long, extensive business relationship with companies other than Lincoln in the disability insurance industry.

41.   MLS' history consists of providing biased medical records reviews from so called alleged "independent" doctors like Dr. Jennings, who repeatedly render opinions favoring disability insurance companies such as Lincoln and which disfavor Lincoln's claimants as occurred in Ms. Maltzberger's LTD claim.

42.   MLS' bias and conflict of interest is chronicled and exposed in *Hertz v. Hartford Life & Accident Ins. Co.*, 991 F. Supp 2d 1121, 1136 (D. Nev. 2014), where the Court reversed the denial of an ERISA disability claim by a conflicted insurance company after allowing discovery into various conflicts of interest on the part of the disability insurance company and its third party vendor MLS, who retained the reviewing medical doctor for the company (*See* Exhibit "C" for *Hertz* decision).

43.   MLS' discovery answers in *Hertz* document that **__95%__** of the time in ERISA disability claims, **__MLS and its retained, reviewing doctors opine a claimant is able to work and is not disabled__**.

44.   The Court in *Hertz* used the discovery answers in part to reverse the denial of benefits by concluding MLS and its retained doctor, Dr. Rim, were biased, not credible or independent as the insurance company had alleged:

> "Accordingly, MLS found that approximately 95% of all claimants could perform some type of work.
>
> During that same time frame, Dr. Rim reviewed fourteen (14) claims for Hartford…Significantly, of those fourteen (14) claims reviewed, Dr. Rim did not find that a single claimant was completely unable to perform any type of work.
>
> Accordingly, Dr. Rim found that 100% of all claimants could perform some type of work.
>
> The Court finds these statistics strongly suggest that ***both MLS and Dr. Rim harbored a significant bias towards finding a claimant capable of performing some type of work***. *See Montour*, 588 F.3d at 634 (noting relevance of statistics regarding Hartford's rate of claims denials or how frequently it contracts with the file reviewers it employed

-7-

in that case to the issue of bias)"(emphasis added)(*See* Exhibit "D" for discovery answers in *Hertz*).

45.     Due to its long standing business relationship with the disability insurance industry and Lincoln, the discovery answers in *Hertz* prove that MLS and its retained doctors are biased and that it has no system or process in place allowing it to monitor the independence and impartiality of the medical professionals it retains to perform medical record reviews as occurred in Ms. Maltzberger's LTD claim.

46.     Ms. Maltzberger alleges that similar to Dr. Rim in *Hertz*, Dr. Jennings is not an "independent" medical reviewer as Lincoln and MLS allege, but is instead a biased, long-time medical consultant who is repeatedly retained by Lincoln, MLS and other disability insurance companies in the industry.

47.     Due to his long-time relationship with Lincoln, MLS and/or the disability insurance industry, Dr. Jennings is biased and operated under his own financial and other conflicts of interest, which led to his selective review of Ms. Maltzberger's evidence, along with his deliberate and blatant de-emphasizing of Ms. Maltzberger's evidence that proved she is disabled.

48.     Lincoln's structural financial conflict of interest and desire to save money, led it to accept and base its unlawful and erroneous denial of Ms. Maltzberger's claim on Dr. Jennings' biased, one sided report and opinions that favored Lincoln.

49.     Due to his conflicts of interest, Dr. Jennings has an incentive to protect his own consulting relationships with Lincoln, MLS and/or the disability insurance industry by providing medical records only "paper reviews" where he selectively reviews, ignores, and de-emphasizes evidence, as occurred in Ms. Maltzberger's claim, so he can provide opinions and report(s) which favor Lincoln and allowed the termination of Ms. Maltzberger's LTD claim/benefit.

50.     Pursuant to 29 U.S.C. §1133, Ms. Maltzberger timely appealed Lincoln's December 9, 2016 termination of her LTD claim/benefits and submitted additional medical

documentation supporting her appeal and her allegation she is disabled and meets any definition of disability in the LTD Policy.

51.     In support of her LTD claim, Ms. Maltzberger submitted to Lincoln a narrative letter authored by her treating medical professional who confirmed the following opinion regarding Ms. Maltzberger's inability to work, "…[Ms. Maltzberger] has been (since my initial assessment) and continues to be unable to meet the requirements of that role, as well as the requirements of any other occupation."

52.     Ms. Maltzberger also submitted a May 10, 2017 Independent Medical Examination report authored by a rheumatologist who after personally examining Ms. Maltzberger, reviewing her relevant medical records and other evidence, concluded, "Based on my clinical evaluation of [Ms. Maltzberger] and my review of her medical records it is my medical opinion [she] has been unable to work in any occupation since December 9, 2016 when [Lincoln] terminated her benefits. It is my medical opinion this will remain the case indefinitely."

53.     Ms. Maltzberger also submitted a Functional Capacity Evaluation report dated May 17, 2017, wherein after an extensive approximately three (3) hour clinical interview, physical examination and simulated objective workplace testing which produced ***valid*** test results, the qualified physical therapist concluded, "[Ms. Maltzberger] would be physically unable to perform a job description at the sedentary work level on a full-time basis" (original emphasis).

54.     Further supporting her LTD claim, Ms. Maltzberger submitted a Vocational Assessment (evaluation) dated June 6, 2017 from a certified vocational expert, who after personally interviewing Ms. Maltzberger to understand the material duties of her occupation and reviewing relevant evidence in her claim regarding her functional limitations, along with the definition of disability set forth in the LTD Policy, concluded, "…it is clear that [Ms.

Maltzberger] cannot perform her own occupation…and cannot perform any occupation in the national economy."

55.     Ms. Maltzberger also submitted updated medical records from her treating medical professionals which confirmed she remained disabled as that term is defined in Lincoln's LTD Policy and that her disabling medical conditions have not improved since she became disabled and last worked.

56.     Ms. Maltzberger also submitted a list of her current medications, along with the adverse side effects/limitations they create and why they preclude her from working in any occupation.

57.     Ms. Maltzberger also submitted a June 3, 2017 sworn affidavit wherein she confirmed she remained unable to work in any occupation and that her disabling medical conditions had not improved since she last worked on April 3, 2016.

58.     Ms. Maltzberger also submitted a June 3, 2017 sworn affidavit by her husband, who confirmed she is unable to work in any occupation and that her disabling medical conditions have not improved in any meaningful way since the date she originally became disabled.

59.     As part of its review of Ms. Maltzberger's LTD claim, Lincoln obtained two (2) medical records only "paper reviews" (meaning the consultants ***never*** saw or physically examined Ms. Maltzberger) from two (2) of doctors named Katherine Herzog, M.D. and K. Adam Anees, M.D.

60.     Both Katherine Herzog, M.D. and K. Adam Anees, M.D. were retained by Lincoln through its third-party vendor named R3 Continuum (hereinafter referred to as "R3").

61.     In his July 17, 2017 medical records review report, Dr. Anees opined Ms. Maltzberger had limitations that precluded her from working in her own occupation as a Sales Agent.

62.     In a letter dated July 25, 2017, Lincoln informed Ms. Maltzberger that it had "completed [its] review of [Ms. Maltzberger's LTD claim] and determined that benefits are payable."

63.     In a letter dated June 13, 2018, Lincoln informed Ms. Maltzberger that since she had received LTD benefits for 24 months, "[continued] disability will be evaluated based on [her] inability to perform the material and substantial duties of her own or any other occupation…"

64.     In the same June 13, 2018 letter, Lincoln confirmed that, "based on this change in the definition of disability and the medical and vocational information in [Ms. Maltzberger's] claim file, we have determined that [she] has qualified for continued benefits."

65.     **_Only one (1) month_** after Lincoln concluded Ms. Maltzberger met the "Any Occupation" definition of disability set forth in the LTD Policy, without any explanation or reason, it launched another review of Ms. Maltzberger's LTD claim.

66.     As part of its review to determine whether Ms. Maltzberger continued to meet the "Any Occupation" definition of disability in the LTD Policy, Lincoln retained a third-party vendor, named Hub Enterprises, Inc., to conduct covert, video surveillance of her and her neighborhood to check her activity level.

67.     Hub Enterprises, Inc. conducted two (2) consecutive days of surveillance of Ms. Maltzberger, on July 20, 2018 and July 21, 2018.

68.     At Lincoln's request, Hub spent a total of 16 hours over the two (2) days trying to obtain video footage of Ms. Maltzberger engaging in an activity(ies) that were inconsistent with what she and her medical professionals previously reported to Lincoln.

69.     Consistent with the evidence Ms. Maltzberger previously submitted to Lincoln, where she confirmed her daily activities are significantly limited as a result of her disabling medical conditions, Hub Enterprises, Inc. *never* observed her leave her house or engage in any activity over the course of two (2) days.

70.     As an additional part of its review of Ms. Maltzberger's LTD claim, Lincoln obtained medical records reviews from *two (2) of its own* employees, Kathy Dennis Yawingu, M.D. and Jonathan Markovitz, M.D.

71.     In her November 6, 2018 medical records review, Dr. Yawingu confirmed it was her opinion that, "the medical records available for review support R&Ls of less than sedentary from 9/2018 to present…available medical records support less than sedentary for the next four months."

72.     In his November 17, 2018 medical records review, Dr. Markovitz confirmed, "the claimant was described as having impairment that leads the claimant to be unreliable to perform her activities of daily living to include her activities of work at this time."

73.     Lincoln approved Ms. Maltzberger's LTD claim and continued to pay her LTD benefits following Drs. Yawingu and Markovitz's records reviews of her claim.

74.     On June 28, 2019, undersigned counsel received a June 27, 2019 facsimile from Ms. Maltzberger's treating medical professional who authored a June 5, 2017 narrative letter in support of her claim for LTD benefits.  Ms. Maltzberger's medical professional forwarded a facsimile from Lincoln's third-party vendor, Network Medical Review ("NMR"), whose retained medical records review doctor, James W. Pearce, M.D., authored the facsimile.

75.     Ms. Maltzberger alleges that NMR is yet another of Lincoln's biased third-party vendors who has a documented long history of serving Lincoln and the disability insurance industry by retaining biased doctors to perform medical records reviews as occurred in her claim.

76.     NMR's conflict of interest in Ms. Maltzberger's claim is evidenced by its long, extensive business relationship and history of providing biased medical records reviews that favor disability insurance companies such as Lincoln and disfavor claimants, such as Ms. Maltzberger in her LTD claim.

77.     Dr. Pearce is not an "independent" medical reviewer as Lincoln and NMR allege and want Ms. Maltzberger and this Court to believe. Dr. Pearce is a biased, long-time medical consultant who is repeatedly retained by NMR, other third-party vendors and other disability insurance companies to perform one-sided medical records reviews such as he did for Lincoln in Ms. Maltzberger's claim.

78.     Due to his long-time and extensive relationship with Lincoln, NMR and/or the disability insurance industry, Dr. Pearce is biased and operated under his own financial conflicts of interest in Ms. Maltzberger's claim.

79.     Dr. Pearce's conflicts of interest led to his selective, one-sided and biased review of Ms. Maltzberger's evidence which is the reason he deliberately and blatantly de-emphasized and minimized her evidence of disability so he could favor Lincoln and NMR by opining she was not disabled.

80.     Due to his bias and financial conflicts of interest, Dr. Pearce has an incentive to protect his own consulting relationships with Lincoln, NMR and/or the disability insurance industry by providing medical records only "paper reviews" where he selectively reviewed, ignored, and de-emphasized evidence that proved Ms. Maltzberger is disabled and entitled to benefits.

81.     Lincoln's structural financial conflict of interest led it to unlawfully accept and use Dr. Pearce's biased opinions that Ms. Maltzberger is able to work and she did not have any restrictions or limitations which precluded her from working.

82.     Ms. Maltzberger's treating medical professional's June 27, 2019 facsimile was the first time she or undersigned counsel became aware that a medical reviewer retained by Lincoln had contacted her treating medical professional regarding her LTD claim.

83.     In a letter dated July 3, 2019, through counsel, based on his experience with Dr. Pearce's records reviews in other client's claims, Ms. Maltzberger informed Lincoln that

Dr. Pearce is biased, not independent, not objective and is repeatedly retained by third-party vendors and disability insurance companies such as Lincoln.

84.   In her July 3, 2019 letter, Ms. Maltzberger's counsel informed Lincoln he was familiar with Dr. Pearce and his bias due to the fact he completed numerous medical records reviews in his other clients' cases, but in spite of overwhelming supportive evidence, Dr. Pearce never concluded a client was unable to work.   The letter also informed Lincoln counsel's clients had significant, credible evidence supporting their claims, but in his reports Dr. Pearce consistently ignored or disregarded his clients' treating medical professionals' opinions they were disabled and unable to work in any occupation due to their medical conditions.

85.   Ms. Maltzberger also informed Lincoln in her July 3, 2019 letter that NMR has a long, extensive history of providing biased medical record only reviews to the disability insurance industry dating back to at least 2002 as documented in *Nolan v. Heald Coll.*, 551 F.3d 1148 (9th Cir. 2009):

> According to Network Medical Review's President and Chief Executive Officer, from 2002 through at least 2005, Network Medical Review and MetLife had a "business relationship . . . whereby MetLife engaged [the] services of [Network Medical Review] to obtain independent medical opinions on the medical conditions of individuals seeking benefits under MetLife disability insurance policies."

> The evidence indicates that MetLife paid Network Medical Review $236,490 in 2002, $569,795 in 2003, $838,265 in 2004, and $1,671,605 in 2005 for these independent medical opinions. By 2005, 25.62% of Network Medical Review's gross income was attributable to payments from MetLife.

86.   In her July 3, 2019 letter, Ms. Maltzberger informed Lincoln that her treating medical professional wanted to discuss her case with Dr. Pearce, because she had critical information/evidence for his consideration and that provided corroborating proof of her allegation she is disabled.

87.     Following a July 16, 2019 teleconference between Dr. Pearce and Ms. Maltzberger's treating medical professional, Dr. Pearce confirmed in an undated addendum records review that although Ms. Maltzberger's medical professional "stated that the claimant had chronic migraines and that she was permanently disabled," the "teleconference in no way changed my original opinion" there are no restrictions or limitation that would be recommended.

88.     On July 23, 2019, Ms. Maltzberger submitted to Lincoln a July 16, 2019 response letter authored by her treating medical professional summarizing the telephone conversation she had with Dr. Pearce on July 16, 2019.

89.     In her July 16, 2019 response letter, Ms. Maltzberger's treating medical professional confirmed "…as of my last office encounter with her on April 10, 2019, there had been no change to [Ms. Maltzberger's] burden of symptoms."

90.     In a letter dated July 30, 2019, Lincoln informed Ms. Maltzberger it was terminating her LTD benefits after using Dr. Pearce's opinions to support its erroneous conclusion that, "…she does not meet the Homesite Insurance Group's definition of disability beyond July 29, 2019."

91.     Lincoln's termination of Ms. Maltzberger's LTD benefits based on Dr. Pearce's biased medical records only "paper review/addendum" and opinions is an abuse of discretion and violates ERISA because in relying on his erroneous opinions, it failed to provide her with a "full and fair" review and failed to investigate her allegations of bias and her claim. *See* 29 C.F.R. § 2560.503-1.

92.     Lincoln's July 30, 2019 termination of benefits letter violated ERISA's notice requirement for several reasons, including that it provided no information regarding how Ms. Maltzberger should or could perfect her claim/appeal so it could be approved prior to it rendering a decision and the denial of her claim.  *See* 29 C.F.R. § 2560.503(1)(g)(1)(iii)) and *Montour v. Hartford Life & Acc. Inc. Co.* 588 F.3d 623, 637 (9th Cir. 2009).

93.     Ms. Maltzberger alleges that Lincoln's termination of her LTD benefits when nothing improved or changed regarding her disabling medical conditions is evidence of its conflict of interest at work, the decision is illogical and an abuse of discretion the Policy may provide it.

94.     Pursuant to 29 U.S.C. § 1133, Ms. Maltzberger timely appealed Lincoln's July 30, 2019 termination of her LTD claim/benefits.

95.     In support of her LTD claim and appeal, Ms. Maltzberger submitted to Lincoln additional reliable, credible, compelling medical and other evidence which provides proof of her allegations that she is disabled and meets the "Any Occupation" definition of disability set forth  in the Policy.

96.     Ms. Maltzberger submitted to Lincoln a *second* Independent Medical Examination report dated January 23, 2020, authored by the same rheumatologist who previously examined her and authored the May 10, 2017 report (paragraph 52), and who after personally examining Ms. Maltzberger for a second time, reviewing her relevant medical records and other evidence, concluded, "…[Ms. Maltzberger] has remained unable to work in any occupation since April 3, 2016."

97.     Ms. Maltzberger also submitted a January 31, 2020 narrative letter authored by the same supporting, treating medical professional referenced above who again confirmed, "It is my opinion that [Ms. Maltzberger] continues to be unable to work in any occupation, and has been unable to do so since my previous narrative letter dated June 5, 2017, thereby meeting the definition of disability then, now, and indefinitely."

98.     The same treating medical professional completed a Questionnaire dated January 31, 2020, wherein she confirmed she reviewed the January 23, 2020 Independent Medical Examination report (paragraph 96) and she *agreed* with the examining rheumatologist's statement that, "…it is my opinion [Ms. Maltzberger] has remained unable to work in any occupation since April 3, 2016."

-16-

99.     Ms. Maltzberger also submitted a *second* Functional Capacity Evaluation report dated September 12, 2019, authored by the same qualified physical therapist who previously administered the functional capacity evaluation on May 16, 2017, wherein after another extensive three (3) hour clinical interview, physical examination and simulated objective workplace testing which produced ***valid*** test results, the medical professional concluded, "…[Ms. Maltzberger's] medical condition has continued to decline since 4/2/2016 and her condition had worsened which renders her physically unable to perform any work including a job description even at the ***sedentary work level*** on a part-time or full-time basis and she does meet the definition of disability" (original emphasis).

100.    Further supporting her LTD claim, Ms. Maltzberger submitted a *second* Vocational Assessment (evaluation) dated February 24, 2020 from the same certified vocational expert who authored the June 6, 2017 report, and who concluded after personally interviewing Ms. Maltzberger again, reviewing relevant evidence regarding her functional limitations and the definition of disability in the LTD Policy that "…[Ms. Maltzberger] is unable to perform the main duties of any occupation, for any employer, whether part-time or full-time that exists in the national economy."

101.    Ms. Maltzberger also submitted updated medical records from her treating medical professionals which continued to confirm she remained disabled as that term is defined in Lincoln's LTD Policy and that her disabling medical conditions had not improved since she became disabled and last worked.

102.    Ms. Maltzberger also submitted a *second* sworn affidavit dated November 2, 2019 wherein she confirmed, "Due to the conditions and limitations I have explained in this affidavit, I continue to be unable to work in any occupation or capacity, and have been since April 2, 2016."

103.    Ms. Maltzberger also submitted to Lincoln a *second* sworn affidavit dated November 2, 2019 authored by her husband, who again confirmed she remained unable to

work in any occupation and that her disabling medical conditions had not improved in any meaningful way since the date she originally became disabled.

104. During a telephone conversation on February 12, 2020 between one of undersigned counsel's paralegals and Charles Johnson, a Lincoln Appeals Consultant, he informed Ms. Maltzberger's counsel (and her) for the first time that her LWOP claim had been denied *three years* earlier on February 9, 2017, but Lincoln never sent a denial letter or any type of written notice to inform her of the denial of the LWOP claim.

105. On February 19, 2020, Mr. Johnson provided undersigned counsel with a copy of Lincoln's *February 9, 2017* denial of Ms. Maltzberger's LWOP claim.

106. The Life Insurance Policy's definition of "Totally Disabled" governing Ms. Maltzberger's LWOP benefit/claim is as follows: "'Total Disability' or 'Totally Disabled' means the complete inability, as a result of Injury or Sickness, to perform the Material and Substantial Duties of Any Occupation."

107. In a letter dated February 27, 2020, Ms. Maltzberger, through undersigned counsel, advised Lincoln that, "…[her] June 6, 2017 letter was submitted as an appeal of the denial of her long-term disability benefits, and the letter also requested for [Lincoln] to '…please allow the letter to serve as an appeal of any and all claims that [Ms. Maltzberger] may have with [Lincoln], including but not limited to a ***waiver of premium claim***'" *(emphasis added)(See* Exhibit "E").

108. During a telephone conversation on February 27, 2020 between one of undersigned counsel's paralegals and Mr. Johnson, Mr. Johnson confirmed he reviewed Ms. Maltzberger's June 6, 2017 appeal letter and as a result of that letter, Lincoln agreed to consider the appeal and review Ms. Maltzberger's LWOP claim during its review of the LTD claim.

109. In a confirming letter dated February 27, 2020, Ms. Maltzberger informed Lincoln that, "it is our understanding ***all*** of the evidence submitted in support of [Ms.

Maltzberger's] LTD claim is being added to [Ms. Maltzberger's] LWOP claim file and will also be considered in the current review of that claim" and she requested, "if anything in this letter is inaccurate…please notify my office immediately."

110.    Lincoln did not respond to Ms. Maltzberger's February 27, 2020 letter confirming its statement it was reviewing both her LTD and LWOP claims.

111.    As part of its review of Ms. Maltzberger's LTD and LWOP claims, Lincoln obtained a medical records only "paper review" from a doctor named Arlen Green, D.O., who was also retained through its vendor NMR.

112.    Both Dr. Green and Dr. Pearce were retained through Lincoln's vendor NMR.

113.    Ms. Maltzberger incorporates by reference all allegations made herein regarding NMR's conflicts of interest and bias which she alleges led to the termination and denial of her LTD and LWOP claims.

114.    Ms. Maltzberger alleges Dr. Green is not an "independent" medical reviewer as Lincoln and NMR allege, he is instead a biased, long-time medical consultant who is repeatedly retained by NMR, other third-party vendors and other disability insurance companies such as Lincoln.

115.    Due to his long-time relationship with Lincoln, NMR and/or the disability insurance industry, Dr. Green is biased and operated under his own financial conflicts of interest.

116.    Dr. Green's bias, conflicts of interest and financial relationships with the disability insurance industry, including the third-party vendor who retained him, are the reasons he rendered an opinion that favored Lincoln and was adverse to Ms. Maltzberger in her LTD and LWOP claims.

117.    Due to his bias and conflicts of interest, like the other doctors retained by Lincoln and its vendors, Dr. Green has an incentive to protect his consulting relationships with Lincoln, NMR and/or the disability insurance industry by providing medical records

only "paper reviews" where he selectively reviews, ignores, and de-emphasizes evidence that proved Ms. Maltzberger was disabled and entitled to benefits, so he could provide opinions favoring Lincoln which allowed the denial of her LTD and LWOP claims.

118.    In a letter dated March 17, 2020, Lincoln provided Ms. Maltzberger with Dr. Green's report and requested for her to "review and comment" on it if she desired.

119.    In Lincoln's March 17, 2020 letter, it erroneously summarized Dr. Green's unsuccessful attempts to contact the physician (rheumatologist) who previously examined Ms. Maltzberger on two (2) occasions and authored the January 23, 2020 and May 10, 2017 Independent Medical Examination reports referenced above.

120.    In a letter dated April 3, 2020, Ms. Maltzberger responded to Lincoln's inaccurate summary by informing it, "[the examining physician's assistant] informed [Ms. Maltzberger] that she ***returned Dr. Green's call on two (2) separate occasions*** to set up the call with [the examining physician]…she did not reach Dr. Green and had to leave a message for him both times but ***never*** received a return call from Dr. Green" (original emphasis).

121.    In her April 3, 2020 letter, Ms. Maltzberger also informed Lincoln that, "after reviewing Dr. Green's report and Lincoln's March 17, 2020 letter, we are not in a position to understand what questions or issues Lincoln believes needs to be addressed and responded to at this time…Lincoln provides [Ms. Maltzberger] with no direction regard what issues need to or must be addressed at this time so she can perfect her claim[s] and [they] can be approved."

122.    Ms. Maltzberger requested in her April 3, 2020 letter for Lincoln, "to engage [her] in the 'meaningful dialogue' that ERISA and Ninth Circuit law require as part of a 'full and fair' review of her claim[s]." *See Salomaa v. Honda Long Term Disability Plan*, 637 F.3d 958, 972 (9th Cir. 2011) and *Montour v. Hartford Life & Accident Inc. Co.,* 588 F.3d 623 (9th Cir. 2009).

123.   On April 28, 2020, Lincoln provided Ms. Maltzberger with a copy of the April 22, 2020 questions posed by Dr. Green to the independent examining physician (rheumatologist) who previously examined her on January 23, 2020 and May 10, 2017.

124.   In a detailed four (4) page letter dated May 8, 2020, Ms. Maltzberger, through counsel, responded to the questions Dr. Green posed to her two (2) time independent examining physician and informed Lincoln, "…[the examining physician] is willing to speak with [Dr. Green] so he can obtain a more accurate picture of [Ms. Maltzberger's] disabling diagnoses and resulting limitations."

125.   In her May 8, 2020 letter, Ms. Maltzberger reiterated all of the points she previously conveyed to Lincoln for why her LTD claim and allegation she is unable to work in "Any Occupation" are supported by her all her evidence and she advised it, "[Ms. Maltzberger] believes Lincoln has the evidence now that it needs to immediately approve her claim."

126.   In a letter dated May 15, 2020, Lincoln acknowledged Ms. Maltzberger's May 8, 2020 letter by stating it understood she, " believe[s] that we now have the evidence needed to approve [her] claim," but informed her it, "…sent a list of questions to [her examining physician]…"

127.   In its May 15, 2020 letter, Lincoln informed Ms. Maltzberger the purpose of its letter was to provide her with additional time to respond to Dr. Green's report if she wanted to.

128.   Lincoln did not provide an explanation in its May 15, 2020 letter as to why Ms. Maltzberger's detailed May 8, 2020 letter was not sufficient for it to approve her claim.

129.   In a three (3) page letter dated May 29, 2020, Ms. Maltzberger provided detailed answers from her examining physician to Dr. Green's questions.  In her letter, Ms. Maltzberger *again* referenced the points previously conveyed to Lincoln which prove her

allegation that she is unable to work in any occupation and also that she meets any definition of disability set forth in the LTD and Life Insurance Policies.

130.    In her May 29, 2020 letter, Ms. Maltzberger's counsel again advised Lincoln that, "with this information, we trust Lincoln is now able to approve [Ms. Maltzberger's LTD and LWOP] claims."

131.    In her May 29, 2020 letter, Ms. Maltzberger reiterated that, "if Lincoln or Dr. Green determines there are any remaining issues which need to be addressed before approving [Ms. Maltzberger's] claims, as I reminded Lincoln in my February 27, 2020 and April 3, 2020 letters, it has a duty per ERISA to engage us in a dialogue and explain the issue so [Ms. Maltzberger] can address them."

132.    On June 5, 2020, Ms. Maltzberger submitted to Lincoln a June 4, 2020 affidavit she authored that directly responded to Dr. Green's review and the questions he posed regarding her claims, by stating, "I have read Dr. Green's report and completely disagree with his opinions.  In my opinion, Dr. Green's report is completely inaccurate, incomplete and irrelevant and shouldn't be considered in my claim[s]."

133.    On June 13, 2020, Lincoln issued a final letter denying Ms. Maltzberger's claims for LTD and LWOP benefits after concluding, "…our position remains that proof of [Ms. Maltzberger's] disability in accordance with the Homesite Insurance Group policy provisions has not been provided."

134.    In its final denial dated June 13, 2020, Lincoln notified Ms. Maltzberger she had exhausted all administrative reviews in her LTD and LWOP claims and could file a civil action lawsuit in federal court pursuant to ERISA.

135.    In its final review of her claims, Lincoln's financial structural conflict of interest led it to unlawfully accept and rely on Dr. Green's biased opinions that Ms. Maltzberger's restrictions and limitations did not preclude her from working in any occupation.

136.   The biased, selective, cherry-picked and unfavorable opinions rendered by Dr. Green were motivated by and resulted from his conflicts of interest as referenced herein and his desire to protect his consulting relationships with NMR, Lincoln and the disability insurance industry.

137.   As referenced in the above paragraphs, in letters dated February 27, 2020, April 3, 2020 and May 29, 2020, Ms. Maltzberger requested for Lincoln to engage her in a "meaningful dialogue" regarding what it believed was necessary so she could perfect her LTD and LWOP claims so they would be approved.

138.   Lincoln failed to respond to any of Ms. Maltzberger's multiple requests for it to engage her in a dialogue.

139.   By failing to respond to Ms. Maltzberger's request for a dialogue, Lincoln failed to provide a "full and fair" review and failed to engage her in the "meaningful dialogue" required by Ninth Circuit law and ERISA. *See* 29 C.F.R. § 2560.503-1.

140.   Lincoln's failure to provide a "full and fair" review and to engage Ms. Maltzberger in a meaningful dialogue also failed to provide it with a complete and accurate assessment of her disabling diagnoses/medical conditions, and her symptoms and limitations which result from those diagnoses and do not allow her to work in any occupation.

141.   If Lincoln complied with ERISA and Ninth Circuit law by engaging Ms. Maltzberger in a meaningful dialogue regarding the deficiencies it believed existed in her LTD and LWOP claims, she and her treating/evaluating medical and other professionals could have perfected the record, and her claims would have been approved rather than denied.

142.   As set forth by Lincoln in its June 13, 2020 final denial, the reasons and deficiencies it alleges existed in Ms. Maltzberger's evidence/claims are not inconsequential, *they are the reasons* why Lincoln denied her LTD and LWOP claims.

143.   All of the reliable, credible evidence Ms. Maltzberger submitted to Lincoln consistently proves she is unable to work in any occupation and she meets the "Any

Occupation" definition of disability in the LTD Policy as well the definition of "Total Disability" set forth in the Life Insurance Policy.

144.    During its review, Lincoln negligently and intentionally committed numerous ERISA procedural violations identified herein that allowed it to unlawfully terminate and deny Ms. Maltzberger's LTD and LWOP claims.

145.    Lincoln's ERISA procedural violations include, but are not limited to, completely failing to credit, reference, consider, and/or selectively reviewing and de-emphasizing all of Ms. Maltzberger's reliable evidence which proves she met the "Any Occupation" definition of disability in the LTD Policy and the Life Insurance Policy's definition of "Total Disability."

146.    In evaluating and denying Ms. Maltzberger's LTD and LWOP claims, Lincoln failed to fulfill its ERISA fiduciary duty to her because it did not administer them, "solely in [her] best interests and other participants." [1]  *See* 29 C.F.R. § 1104(a).

147.    Ms. Maltzberger alleges Lincoln's review was neither full nor fair and violated ERISA, specifically, 29 U.S.C. § 2560.503-1, for many reasons including, but not limited to: failing to meet ERISA's notice requirement by informing Ms. Maltzberger what was necessary to perfect her claims/appeals; by failing to credit Ms. Maltzberger's credible, reliable evidence; by abdicating and outsourcing its ERISA fiduciary duty in retaining biased third-party vendors/companies (MLS, R3, NMR) who in turn retained biased medical record reviewers (Drs. Jennings, Herzog, Anees, Yawingu, Markovitz, Pearce and Green) to review

---

[1] It sets forth a special standard of care upon a plan administrator, namely, that the administrator "discharge [its] duties" in respect to discretionary claims processing "solely in the interests of the participants and beneficiaries" of the plan, § 1104(a)(1); it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators "provide a 'full and fair review' of claim denials," Firestone, 489 U.S., at 113, 109 S. Ct. 948, 103 L. Ed. 2d 80 (quoting § 1133(2)); and it supplements marketplace and regulatory controls with judicial review of individual claim denials, see § 1132(a)(1)(B). *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2350 (U.S. 2008).

Ms. Maltzberger's medical records and render opinions in her LTD and LWOP claims; by failing to have Ms. Maltzberger's claims reviewed by truly independent third-party vendors and independent medical records reviewers; by de-emphasizing, cherry picking and selectively reviewing Ms. Maltzberger's evidence so it could terminate and deny her LTD and LWOP claims; by providing biased and one sided reviews of Ms. Maltzberger's LTD and LWOP claims that failed to consider all the evidence she submitted and/or by de-emphasizing her evidence which proves she is entitled to benefits; by disregarding and/or failing to consider Ms. Maltzberger's disabling subjective and self-reported complaints/symptoms and limitations; by failing to consider the *combined and aggregate effect* that all her disabling medical conditions and resulting limitations documented in her evidence had and have on her ability to work in any occupation; by failing to engage Ms. Maltzberger in a "meaningful dialogue" so she and her treating and/or evaluating medical/vocational professionals could respond to Lincoln's medical records reviewers reports (Drs. Jennings, Herzog, Anees, Yawingu, Markovitz, Pearce and Green); by precluding Ms. Maltzberger from being able to submit the evidence that was necessary to perfect her LTD and LWOP claims so they could be approved; and by failing to consider the adverse impact the side effects Ms. Maltzberger's medications have on her, and why they preclude her from working in any occupation.

148.    The procedural violations set forth above precluded Lincoln from providing a "full and fair" review, and from correctly determining that Ms. Maltzberger was disabled and entitled to LTD and LWOP benefits.  If the Court is unable to determine whether Ms. Maltzberger is entitled to LTD and/or LWOP benefits, her claims should be remanded to Lincoln so it can remedy its procedural violations and provide a "full and fair" review, as required by ERISA and federal law. *See* 29 C.F.R. § 2560.503-1.

149.    Ms. Maltzberger alleges one reason Lincoln provided an unlawful review that was neither full nor fair and that violated ERISA, specifically, 29 U.S.C. § 2560.503-1, is

due to its financial conflict of interest which manifested as a result of Lincoln's roles as the decision maker and the payor of benefits.

150.    Lincoln's conflict of interest provided it with a financial incentive to deny Ms. Maltzberger's LTD claim, because every dollar it saved by not paying her LTD claim now represents profits for Lincoln.

151.    Lincoln's conflict of interest provided it with a financial incentive to deny Ms. Maltzberger's LWOP claim, because every dollar it saved by not waiving the premiums on her life insurance coverage and avoiding a potential life insurance claim represents profits for Lincoln.

152.    In *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003), the Supreme Court warned about biased, conflicted insurance company retained doctors, such as Drs. Jennings, Herzog, Anees, Yawingu, Markovitz, Pearce and Green, who are repeatedly retained by disability insurance companies and/or third-party vendors, such as MLS, R3 and NMR, to review disability claims by noting, "Nor do we question the Court of Appeals' concern that physicians retained by benefits plans may have an 'incentive to make a finding of not disabled' in order to save their employers money and to preserve their own consulting arrangements."

153.    Lincoln's blatant self-serving actions are similar to the conflicted, unlawful review by the insurance company in *Salomaa v. Honda Long Term Disability Plan,* 642 F.3d 666, 680 (9th Cir. 2011), where the Court referenced the motives that arise from the conflict, "The plan with a conflict of interests also has a financial incentive to cheat."

154.    When Lincoln terminated and denied Ms. Maltzberger's LTD and LWOP claims, it cheated her out of benefits in the same manner the insurance company cheated Mr. Salomaa out of his benefits.

155.    Regardless of the standard of review, discretionary or *de novo*, Ms. Maltzberger is entitled to discovery regarding Lincoln's aforementioned conflicts of interest, its bias and

business relationships referenced herein, as well as the conflicts of interest of any third-party vendor(s)(including but not limited to MLS, R3, NMR) hired by Lincoln and any medical professional (including but not limited to Drs. Jennings, Herzog, Anees, Yawingu, Markovitz, Pearce and Green) Lincoln employed or retained in its review of her LTD and/or LWOP claims.

156.    Regardless of the standard of review, the Court should permit discovery so it can properly weigh and consider the nature, extent and effect that *any conflict of interest* and/or any ERISA procedural violation had on in influencing Lincoln's decision to deny Ms. Maltzberger's LTD and LWOP claims.

157.    Even if the Court concludes Lincoln's Policies lawfully confer discretion, the standard of review should be *de novo* in both claims because Lincoln's numerous ERISA procedural and other violations set forth herein are so egregious, they warrant *de novo* review.

158.    Ms. Maltzberger seeks any and all employee benefits, including but not limited to disability benefits, life insurance coverage and the waiver of any premiums due on that life insurance coverage, and any other benefits she may be entitled to and due from the Defendants as a result of being found disabled in her claims.

159.    Pursuant to 29 U.S.C. § 1132, Ms. Maltzberger is entitled to recover unpaid disability and non-disability employee benefits, prejudgment interest, reasonable attorney's fees and costs from Defendants.

160.    Ms. Maltzberger is entitled to prejudgment interest at the legal rate pursuant to A.R.S. § 20-462, or at such other rate as is appropriate to compensate her for the losses she has incurred as a result of Defendant's nonpayment of benefits.

### *Count I - Claim for Long-Term Disability Benefits*

155.    All previous paragraphs are incorporated by reference as though fully set forth herein.

156.    The LTD Policy promises that Ms. Maltzberger is entitled to a portion of her pre-disability earnings at a certain amount if she meets the LTD Policy's "Any Occupation" definition of disability.

157.    Ms. Maltzberger has submitted to Lincoln evidence that is sufficient to prove she met and continues to meet the "Any Occupation" definition of disability set forth in the LTD Policy.

158.    As a direct result of Lincoln's decision to deny Ms. Maltzberger's LTD claim, she has been injured and suffered damages in the form of lost LTD benefits, in addition to other potential non-disability employee benefits she may be entitled to receive through or from the LTD Plan, from any other Company Plan and/or the Company itself (as a result of being found disabled in her LTD claim).

159.    Upon information and belief, Ms. Maltzberger believes other potential non-disability employee benefits may include but not be limited to, health insurance (coverage) and other insurance related coverage or benefits, retirement benefits or a pension.

160.    Ms. Maltzberger seeks any and all employee benefits, and/or any other benefits she may be due from Defendants as a result of being found disabled in this matter.

### *Count II - Claim for Continued Life Insurance Coverage and the Life Insurance Waiver of Premium Benefit (LWOP claim)*

161.    All previous paragraphs are incorporated by reference as though fully set forth herein.

162.    The Life Insurance Policy promises that if Ms. Maltzberger is found to meet the "Total Disability" definition of disability set forth therein, she is entitled to life insurance coverage for herself and her family/dependents which includes a waiver of any premiums due on that life insurance coverage.

163.    Ms. Maltzberger submitted evidence proving that she met and continues to meet the definition of "Total Disability" set forth in the Life Insurance Policy.

164.   As a direct result of Lincoln's decision to deny Ms. Maltzberger's LWOP claim, she has been injured and suffered damages in the form of lost life insurance coverage for herself and her family/dependents, and the waiver of any premiums due on that life insurance coverage for herself and her family/dependents.

165.   Due to Lincoln's denial of Ms. Maltzberger's LWOP claim, she may have also lost other potential non-disability employee benefits through or from the Life Insurance Plan, from any other Company Plan and/or the Company itself (as a result of being found disabled in this matter).

166.   Upon information and belief, Ms. Maltzberger alleges other potential non-disability employee benefits she may be entitled to as a result of being found disabled in either her LTD and/or LWOP claims include but are not limited to, health insurance (coverage) and other insurance related coverage or benefits, retirement benefits or a pension.

167.   Ms. Maltzberger seeks any and all employee benefits, and/or any other benefits she may be due from Defendants as a result of being found disabled in either or both of her LTD and/or LWOP claims.

WHEREFORE, Ms. Maltzberger prays for judgment as follows:

A.   For an Order finding the evidence in her LTD claim is sufficient to prove she met and continues to meet the "Any Occupation" definition of disability set forth in the relevant LTD Plan and/or LTD Policy, and she is entitled to LTD benefits, and any other non-disability employee benefits as a result of that Order, from the date she was first entitled to these benefits but was denied them, through the date of judgment with prejudgment interest thereon;

B.   For an Order directing Defendant to continue paying Ms. Maltzberger the aforementioned LTD benefits until such a time as she meets the conditions for the termination of benefits;

C.     In the event the Court is unable to render a decision as to whether Ms. Maltzberger is entitled to LTD benefits from Defendant for any reason, she seeks an Order remanding her LTD claim and this case to Lincoln so it can render a determination consistent with the Order issued by the Court;

D.     For an Order finding the evidence in Ms. Maltzberger's claim for the LWOP benefit is sufficient to prove she meets the definition of "Total Disability" set forth in the Life Insurance Plan and/or Life Insurance Policy, and that she is entitled to these benefits, and any other employee benefits she may be entitled to as a result of that Order, from the date she was first denied these benefits through the date of judgment with prejudgment interest thereon;

D.     For an Order directing Defendants to continue providing life insurance coverage for Ms. Maltzberger and her family/dependents, and to waive any premiums due on this life insurance coverage until such time as she meets the conditions for the termination of these benefits;

E.     In the event the Court is unable to render a decision as to whether Ms. Maltzberger is entitled to life insurance coverage and the waiver of any premiums due on the life insurance coverage for any reason, she seeks an Order remanding her LWOP claim and this case to Lincoln so it can render a determination consistent with the Order issued by the Court;

F.     In the event the Court is unable to render a decision in both of Ms. Maltzberger's LTD and LWOP claims, she seeks an Order remanding them to Lincoln so it can render a determination consistent with the Order issued by the Court;

G.     For attorney's fees and costs incurred as a result of prosecuting this suit pursuant to 29 U.S.C. §1132(g); and

H.     For such other and further relief as the Court deems just and proper.

DATED this 10th day of November, 2020.

SCOTT E. DAVIS. P.C.

By: /s/ Scott E. Davis
Scott E. Davis, Esq.
Attorney for Plaintiff